AO 91 (Rev. 08/09)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.  **1:25-MJ-00287** |
| JEROME O. MITCHELL | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ December 18, 2023 _____ in the county of _____ Hamilton _____ in the _____ Southern _____ District of _____ Ohio _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 846 | Conspiracy to Possess with Intent to Distribute 5 Kilograms or More of Cocaine; |
| 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 846 | Conspiracy to Possess with Intent to Distribute 400 Grams or More of Fentanyl. |

This criminal complaint is based on these facts:

See Affidavit

☑ Continued on the attached sheet.

_Rebecca L.S. DeBord_
_____
Complainant's signature

Rebecca L. S. DeBord, Special Agent
_____
Printed name and title

Subscribed and sworn to before me by reliable electronic means, specifically, FaceTime video conference, in accordance with Fed. R. Crim. P. 4.1.

Date:  **Mar 31, 2025**
_____

_Stephanie K. Bowman_
_____
Judge's signature

City and state:  _____ Cincinnati, Ohio _____    Hon. Stephanie K. Bowman, U.S. Magistrate Judge
_____
Printed name and title

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **IN THE MATTER OF A CRIMINAL COMPLAINT AND ARREST WARRANT FOR: Jerome O. MITCHELL** | **Case No.**   __1:25-MJ-00287__ <br><br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF A CRIMINAL
COMPLAINT AND ARREST WARRANT**

I, Rebecca L. S. DeBord, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of a criminal complaint and arrest warrant for Jerome MITCHELL ("MITCHELL") charging him with conspiracy to possess with intent to distribute five kilograms or more of cocaine and 400 grams or more of fentanyl, in violation of Title 21, U.S.C. §§ 841(b)(1)(A) and 846 (the "**Subject Offenses**"). This affidavit is submitted for the limited purpose of demonstrating probable cause to issue a criminal complaint and arrest warrant and therefore I have not revealed each and every fact I know about this investigation.

2.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been since September 2022.  I am currently assigned to the Violent Crime Squad in the Cincinnati FBI Field Office. My primary duties as an FBI SA consist of investigating criminal enterprises, narcotics investigations, organized crime, and violent crimes to include unlawful possession and possession with intent to distribute controlled substances, as well as the associated conspiracies in violation of 21 U.S.C. §§ 841, 843, and 846. I am familiar with federal firearms laws, and investigations into possession of a firearm by a convicted felon, possessing a firearm in furtherance of a drug trafficking crime and the associated violations under 18 U.S.C. §§ 922 and 924. As part of my standard training to become a FBI SA, I have received specialized training in the means and methods by which individuals and criminal enterprises conduct their illegal activities, as well as the use of various investigative techniques to uncover unlawful activities. Based upon my

1

experience and training, I am familiar with the ways in which drug traffickers conduct their unlawful drug trafficking activity, including, but not limited to, their use of code words and numbers to conduct their transactions, their use of multiple telephones to conduct their illegal activities, their methods for concealing narcotics and narcotics proceeds and their use of firearms, violence, and threats of violence to protect their criminal organization. Prior to my current assignment, I was employed for approximately 7 years as a Police Officer with the Lexington Police Department in Lexington, Kentucky.

3.      I have participated in various types of electronic surveillance, including the interception of wire communications, in investigations of drug traffickers, money launderers and violent criminal enterprises.  I am also familiar with, and have personally participated in, other methods of investigating criminal enterprises, including, but not limited to, visual surveillance, the questioning of witnesses, the use of informants, undercover operations, and the use of pen registers, including pen registers in the form of digital analyzers.

4.      By virtue of my involvement in these investigations, I have become familiar with the various means and mechanisms used by drug traffickers to import and distribute controlled substances and to remain at large without being detected by law enforcement. I am familiar with the fact that drug traffickers make tremendous profits through drug trafficking and require large amounts of currency to operate surreptitiously.

5.      Through discussions with other experienced agents and interviews, I have become familiar with the day-to-day operations of distributors and transporters of controlled substances. I have gained knowledge regarding the various methods, techniques, codes, and/or jargon used by illegal drug traffickers in the course of their criminal activities. This includes information about the packaging and preparation of narcotics, methods in which illicit drugs are smuggled, transported, and distributed, and security measures commonly employed by narcotics traffickers. These security measures include the use of firearms to protect their narcotics-related activities, and

2

the use of cellular telephones, pagers, and personal digital assistants to facilitate communications while attempting to avoid law enforcement scrutiny.

6.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.      Based on the facts as set forth in this affidavit, there is probable cause to believe that the **Subject Offenses** have been committed by MITCHELL.

## **PROBABLE CAUSE**

8.      Since May 2023, the FBI, the Drug Enforcement Administration (DEA) Cincinnati Field Division Office (DEA Cincinnati), and the Hamilton County Sheriff's Office (HSCO) Regional Enforcement Narcotics Unit (RENU) have been jointly investigating a large-scale poly-drug trafficking organization (DTO) network led by Jerome O. MITCHELL (the "MITCHELL DTO"). In September 2023, RENU agents executed search warrants at 812 and 814 East Mitchell Avenue, Cincinnati, Ohio. Agents recovered approximately nine kilograms of fentanyl from the truck of a Jaguar sedan (registered to Derrick BALDWIN) parked in the shared driveway behind 812 and 814 East Mitchell Avenue and over four kilograms of cocaine, four firearms and approximately $60,000.00 US currency from inside of 814 East Mitchell Avenue, Cincinnati, Ohio. A black Range Rover (registered to Jerome MITCHELL) bearing Ohio registration plate: JGV4517 was present next to the Jaguar sedan. Throughout the course of this investigation, agents have cultivated cooperating defendants, informants, and FBI Confidential Human Sources (CHSs). One such confidential source (hereinafter "CS-1")[1] provided information pertaining to the

---

[1] CS-1 is working for case consideration on a pending federal narcotics investigation and has a criminal history that includes drug trafficking. CS-1 has knowledge of the MITCHELL DTO, MITCHELL and other members of the DTO based upon prior business dealings. CS-1 has provided information in the past that has been independently corroborated and law enforcement therefore believes that the information provided by CS-1 is truthful and reliable.

3

MITCHELL DTO's organization, structure and identified members that work for MITCHELL in furtherance of the MITCHELL DTO.

9.      On December 18, 2023, at the direction and under the supervision of law enforcement, CS-1 completed a recorded FaceTime call with MITCHELL from inside of the Hamilton County Justice Center (HCJC). During their recorded conversation CS-1 asked MITCHELL to assist them while they were inside of the HCJC. MITCHELL agreed to assist CS-1 with introducing cocaine into the HCJC for CS-1 to traffic throughout, via a "rolla[2]".

10.      The conversation then turned to the discussion of several members of the MITCHELL DTO, their involvement and MITCHELL's source(s) of narcotic supply. At one point in the conversation, Adonis ONEAL ("AD"), MITCHELL's (then) primary "runner" was specifically discussed.

11.      The following excerpts of the conversations were stated:

    a.  CS-1 stated to MITCHELL that they needed to "bust me a couple of moves"

    b.  MITCHELL: "What you need me to do?"

    c.  CS-1: "Need someone to catch up with this "rolla" (a compromised correctional officer and/or employee with the capability of introducing contraband within the secure facility for payment) for me"

    d.  MITCHELL: "What I gotta give him?"

    e.  CS-1: "Right now everything is pumping in this mother fucker paper, soft, fent, all that shit…."

    f.  MITCHELL: "What do I just give him a package or some "KD2"."

    g.  CS-1: "I think I'm gonna stick with what I know…."

    h.  MITCHELL: "So you want me to give him some girl (cocaine)?"

    i.  CS-1: "Yep."

    j.  MITCHELL: "How much?"

    k.  CS-1: "Something light like a zip or something, I don't want nothing heavy."

---

[2] A Rolla is a compromised correctional officer and/or employee with the capability of introducing contraband within the secure facility for payment

     l.   MITCHELL: "He gonna take it?"

     m.  CS-1: "Hell yeah he gonna take it, I just hollered at him."

     n.   MITCHELL: "When he ready, when he ready?"

     o.   CS-1: "Shit I don't know but it will be in the next couple of days."

     p.   MITCHELL: "Alright say no more, all you gotta do is tell me."

12.     MITCHELL and CS-1 talked about property that MITCHELL owned on Westwood and Ridgeway that "Ace" (Vincent Hargrove) and "Kimbo" (Bo Hunter) work on.

13.     MITCHELL showed CS-1 pictures of box trucks from one of his other phones.

     a.   MITCHELL: "You need to get you one of these and get you some flow… get you one of these and get you somebody in it. I just bought this (showed CS-1 another picture) see this?"

     b.   CS-1: "That's what we mother fuckin need."

     c.   MITCHELL: "Yep I'm gonna get you one."

14.     As the conversation between CS-1 and MITCHELL continued, Adonis ONEAL (aka "AD") and his position within the MITCHELL DTO was discussed:

     a.   MITCHELL: ONEAL "doesn't have a pot to piss in" and stated he (MITCHELL) has not talked to (ONEAL) since the days following the seizure of nine kilograms of fentanyl and four and a half kilograms of cocaine from 814 East Mitchell Avenue Cincinnati, Ohio. MITCHELL stated ONEAL does not have his phone number (since dropping cell phone numbers).

     b.   CS-1: "I can't believe "AD" left me holding the bag."

     c.   MITCHELL: "Me either man." CS-1 stated he felt like ONEAL possibly set him up to be arrested.

     d.   CS-1: "And the money lost behind that…"

     e.   MITCHELL: "The good thing is that we are so connected…". MITCHELL stated that when he told the source of his narcotics what happened they stated "what the fuck". MITCHELL stated he told the source of narcotics "all we can do is keep it going… that's the only way".

     f.   MITCHELL stated to CS-1 if he knew he could get away with not paying the source of narcotics for the narcotics he would have.

g. MITCHELL stated the source of narcotics asked him to produce paperwork showing the arrest and seizure of the narcotics.

h. CS-1 explained to MITCHELL when they ran into him (MITCHELL) at the "fields" the day before the arrest, that MITCHELL needed to grab the narcotics that ONEAL "put on CS-1" because ONEAL was "feeling "tweeky" about it." MITCHELL had assumed that the narcotics had already been picked up by ONEAL until this point.

i. CS-1 continued by stating they met with ONEAL at Bar 29 nights prior because ONEAL felt like people were "casing his joint" (4409 Paddock Road Cincinnati, Ohio 45229) that night. CS-1 stated they didn't think nothing of it because somebody broke into ONEAL'S apartment months beforehand and allegedly stole a kilogram and 50 thousand dollars in U.S. currency.

j. MITCHELL responded to CS-1 by stating he told ONEAL "He (ONEAL) could have taken it to the "spot". MITCHELL stated ONEAL told him "That "licks" were staying there." MITCHELL stated he told ONEAL "So what it's a fucking building people live there."

k. CS-1: CS-1 believed ONEAL "felt some kind of way" about the transition once CS-1 was released from prison. (CS-1 stated to agents MITCHELL was transitioning ONEAL's role in the drug trafficking organization to CS-1 after CS-1 was released from prison.

l. MITCHELL: (When talking about the seizure of the narcotics and money from 814 E Mitchell Avenue Cincinnati, Ohio) "All around the board that was a big one"

m. CS-1: "The morning of the arrest he/she was on their way to get the rental to head to Chicago."

n. MITCHELL: "The day of the arrest ONEAL called him to tell him of the arrest."

o. CS-1: "After leaving MITCHELL in Woodward the day before the arrest CS-1 ran into ONEAL." CS-1 asked ONEAL when he wanted to meet CS-1 to give him back the narcotics. CS-1 stated ONEAL stated he would call CS-1 in an hour. CS-1 stated ONEAL never called him.

15. MITCHELL stated he knew, "Some people's heads gotta roll."

a. MITCHELL went on to state "my girl's people were cool cause it wasn't that much damage". MITCHELL stated that he "took care of that". MITCHELL's "girl's people" handle the cocaine supply in the MITCHELL DTO and MITCHELL paid off the remailing balance for the cocaine.

b. CS-1 stated there were a total of 15 kilograms of cocaine from that particular transaction, and the other kilograms of cocaine were sold off. CS-1 stated three kilograms of cocaine went to Terrence HUFF and the other kilograms of cocaine

6

were pieced out. CS-1 stated the MITCHELL DTO was only out to the plug (supplier) for the four and a half kilograms of cocaine that were seized by law enforcement.

c.   MITCHELL stated that his girl's "people" told him how to handle the "other people" (fentanyl source of narcotics). MITCHELL stated they told him "Don't tell them just yet just let it go by for a minute because they aint going to believe you. At least get some kind of paperwork of something he said."  MITCHELL stated they said, "they need you".

d.   MITCHELL stated he told the source of the fentanyl that he was out of town and got a call that the narcotics were seized.

e.   MITCHELL stated that once the arrest and seizure happened his girl's "people" stated they would pay "half" for the bond stating, "we need him out".

f.   MITCHELL stated his source of fentanyl asked how the person arrested was doing and what he may need, MITCHELL stated "money". MITCHELL stated the source of fentanyl replied, "well we gotta get busy, we gotta get back on."

g.   MITCHELL stated he told ONEAL he might have to "go down there" referring to ONEAL turning himself in and claiming the seized narcotics. MITCHELL stated ONEAL called him crying stating he "fucked up".

h.   MITCHELL stated he was mad having a "druggie think for me".

i.   CS-1 stated that if ONEAL would have called CS-1 instead of MITCHELL the night CS-1 went to Bar 29 to pick up the narcotics CS-1 would have never went, but since it was MITCHELL's request CS-1 went.

j.   MITCHELL stated the night before the arrest and seizure, ONEAL called him asking what was up with "Bruh" (referring to Jarmon HARGROVE), MITCHELL stated he told ONEAL "to wait the people out" who he thought were casing his apartment.

k.   MITCHELL: "I had just took the whole other load on the other shit…you bust'n plays and he counting the money and you doing mass shit… I'm the only one taking the hit. You see what I'm saying? Like you can't protect nothing… how you gonna protect my shit… I gotta wean this nigga out… no need to give it to anybody." MITCHELL stated, "that's why I pay rent for a spot for just that."

l.   MITCHELL stated that is why he ran out of town because everybody was saying everything was his and other "shit getting knocked" referring to the narcotics seized.

m.   MITCHELL stated he "aint just fucking with anybody". MITCHELL stated he shut down his Cash App and all social media due to people trying to get a photo of "Skrow".

n. MITCHELL stated that he was on a roll referring to when they were selling narcotics. CS-1 stated he/she "was pushing through (the narcotics) so fast and the money was always right." MITCHELL acknowledged that CS-1 was "the best partner he has ever had."

o. MITCHELL stated he had to use ONEAL because he didn't have anybody (due to people being incarcerated). MITCHELL stated when CS-1 got out of prison "it was on and they were weaning ONEAL out."

p. MITCHELL stated "There aint no way they get that lucky… they probably thought they were going to get a few zips…there's no way." MITCHELL then asked CS-1 if he had received the search warrants for the case yet, CS-1 stated, "Nah not yet".

16. Shortly thereafter the phone call was disconnected, and the call was ended. Notably, while CS-1 was conducting the audio/video recorded conversation with MITCHELL, Kirt WILLIS (aka "Waters") also FaceTimed MITCHELL via a separate phone and requested "four and a half zips." (A "zip" is common street language indicating an ounce of narcotics.)

17. Based on evidence obtained as a result of this investigation, I believe probable cause exists that MITCHELL conspired to possess with intent to distribute five kilograms or more of cocaine and 400 grams or more of fentanyl, in violation of Title 21, U.S.C. §§ 846 and 841(b)(1)(A).

## REQUEST FOR SEALING

18. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their

premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

*Rebecca L.S. DeBord*

Rebecca L. S. DeBord
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me by reliable electronic means, specifically, FaceTime video conference, in accordance with Fed. R. Crim. P. 4.1, on March ___31___, 2025.

*Stephanie K. Bowman*

HONORABLE STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE